IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| **Samuel Thomas**, ) | Civil Action No. 2:12-1249-DCN-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| **CMC Steel Fabricators, Inc.,** ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This action has been filed by the Plaintiff, a former employee of the Defendant,

pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et</u>. <u>seq</u>. Plaintiff, an

African-American, alleges that the Defendant discriminated against him on the basis of his race.

The Defendant filed a motion for summary judgment pursuant to Rule 56,

Fed.R.Civ.P., on August 7, 2013. Plaintiff filed a memorandum in opposition to the Defendant's

motion on August 26, 2013, following which the Defendant filed a reply memorandum on September

9, 2013. The Defendant's motion is now before the Court for disposition.[1]

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendant has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

1



## **Background and Evidence**[2]

Plaintiff began working for the Defendant in 2005 as a material handler. Over the course of his career with the Defendant, Plaintiff worked in several different positions, eventually rising to the position of Rebar Supervisor. In this job, Plaintiff directly supervised George Richardson (African American), who worked as a Rebar Fabricator. See Defendant's Memorandum in Support of Summary Judgment, p. 2[3]; see also Plaintiff's Deposition, p. 82; Richardson Deposition, pp. 9-28.

On Friday, January 9, 2009, Plaintiff was working with Richardson, whose arm was in a cast, in the warehouse moving rebar with the overhead crane that was mounted to the ceiling. Plaintiff's Deposition, pp. 32-34; Weeks Deposition, p. 37. A fellow employee and truck driver, Harold "Gene" Womack (white), was also present. Plaintiff's Deposition, pp. 34, 92. Wilmoth Deposition, p. 30. At some point a problem developed with the remote control used to operate the crane, and it quit working. Plaintiff's Deposition, pp. 34-35. However, although the remote was not working, the overhead crane could also be operated by a secondary, "pendant" control, which somehow affixed to the crane near the ceiling, and in an attempt to gain a better vantage point, Plaintiff lifted Richardson into the air on a pallet using a forklift, with instructions for Richardson to see what was holding the secondary control in place. Plaintiff testified that he was aware of the safety requirement requiring the wearing of a harness for work at heights exceeding six (6) feet, and that he was careful not to lift Richardson above that height. Plaintiff's Deposition, pp. 36-38.

---

[2]The facts and evidence are considered and discussed herein in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

[3]Although Defendant did not provide record cites for these facts in its brief, they are not contested.



Richardson also testified that he was only lifted approximately three (3) feet off the ground. Richardson Deposition, pp. 19, 42. After assessing what needed to be done next, Plaintiff told Richardson that he was bringing him down and going to get a safety harness in order to proceed. Plaintiff's Deposition, pp. 36-39.

Plaintiff testified that at that point Alex Krekich (white),[4] the Inside Sales/Operational Manager, came in smoking a cigarette, saw them, and yelled "hey, y'all too high". Plaintiff's Deposition, pp. 39-41; Krekich Deposition, p. 23. Plaintiff told Krekich that "the cardinal[5] safety rule is if we're over six feet then we have to wear a safety harness. . . . we was not attempting to get the secondary remote down, we just wanted to see what material was holding it up." Krekich, who believed Richardson was eight feet or more off the ground, then walked out. Plaintiff's Deposition, p. 41. Krekich Deposition, p. 28.[6] Krekich then ran into Plaintiff's supervisor, Kyle Weeks (white), the Defendant's Area Manager, who was on his way into the shop, and told Weeks, "[Y]ou have got to f—ing see what's going on back there." Weeks Deposition, pp. 7, 31-32; Krekich Deposition, pp. 18-19, 23. Weeks testified that when he came into the shop, he saw the forklift with Richardson on it, and that the pallet and forks were at that time coming down. Weeks Deposition, p. 31. However,

---

[4]Krekich was employed by the Defendant from 2002 through January 2010. Krekich Deposition, pp. 10-11.

[5]Don Strickland, Area Safety Coordinator, explained that "cardinal" safety rules are defined pursuant to the construction industry's standard for OSHA, and that a violation of a cardinal safety rule could lead up to termination. Strickland Deposition, pp. 8, 43; see also Wilmoth Deposition, p. 26. Below six (6) feet was not a "cardinal" safety rule violation.

[6]Gene Womack testified in his deposition that Richardson may have been lower to the ground than Krekich believed, although he had earlier told the EEOC investigator that Richardson was "about eight feet off the ground." Womack Deposition, pp. 53, 80-82. Another employee, Larry Green, was also present during this incident. Plaintiff's Deposition, pp. 40, 43. There was apparently more than one "Larry" who worked for the Defendant, so it is unclear what race Larry Green is.



Weeks testified that he believed Richardson was more than six (6) feet off the ground, although he did not have an exact measurement. <u>Weeks Deposition</u>, pp. 29-30, 33, 60. Weeks testified that the crane was at head height, and that Richardson was not wearing the required fall protection. <u>Weeks Deposition</u>, pp. 29-31, 60; <u>see also</u> <u>Krekich Deposition</u>, p. 23; <u>Plaintiff's Deposition</u>, p. 39, 135.

Plaintiff testified that he lowered Richardson and walked toward the front, where he saw Krekich. Krekich called Plaintiff into his office and told him that Weeks had seen what had happened, although Plaintiff testified that Womack and Green both told him that Weeks was not present. <u>Plaintiff's Deposition</u>, pp. 41, 43-44. Plaintiff testified that they then cleaned the Rebar shop before leaving work. <u>Plaintiff's Deposition</u>, p. 47.

There is no evidence that Plaintiff had any history of prior misconduct or had received previous reprimands, safety or otherwise, before this incident. However, on the Monday following the incident (January 12, 2009), Weeks told his boss, Scott Williams(white), the Defendant's General Manager and Vice President, what he had seen during the incident on Friday, and Williams stated that the Defendant would have to terminate the employees' employment, although Weeks was the decisionmaker for purposes of Plaintiff's claim. <u>Weeks Deposition</u>, pp. 50-51; <u>see</u> <u>Defendant's Reply Brief</u>, p. 2.[7] Plaintiff and Richardson were then both terminated for violation of the Defendant's safety rules. <u>Plaintiff's Deposition Exhibit 10</u> (Plaintiff's Exhibit K). The Personnel Action Directive that Weeks prepared stated: "Sam [Plaintiff] was involved in 3 violations of safety policies on Friday. (1) George Richardson was not supposed to be in the shop due to "Light Duty" Status. (2) Lock out tag out was not properly conducted on the crane (3) Fall protection over 6 feet

---

[7]<u>See also</u>, <u>Plaintiff's Deposition</u>, p. 130; <u>Richardson Deposition</u>, p. 28; <u>Strickland Deposition</u>, p. 42; Court Docket No. 32-1, pp. 100-101.



was not executed." <u>Plaintiff's Deposition Exhibit 10</u>; (Plaintiff's Exhibit K).

Following his termination, Plaintiff filed an administrative charge of discrimination asserting race discrimination, race harassment, and retaliation, and in which he stated that white employees had committed the safety violations of which he had been accused and had not been terminated, that there had been a pattern and practice of racial discrimination, and that he had been harassed and discriminated against on the basis of his race. <u>Plaintiff's Deposition Exhibit 12</u>. After receiving a Right to Sue letter, Plaintiff filed this action in United States District Court alleging that he had been harassed and terminated based on his race in violation of Title VII and 42 U.S.C. § 1981, and that he was subjected to an adverse employment action and terminated for complaining about discriminatory conduct in violation of Title VII. In his response in opposition to summary judgment, Plaintiff concedes his harassment and retaliation claims, and proceeds only on his termination claim. <u>See</u> <u>Plaintiff's Memorandum in Opposition</u>, p. 1.[8]

## <u>Discussion</u>

The Defendant has moved for summary judgment in this case. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. <u>Temkin v.</u>

---

[8]Plaintiff's Complaint also originally contained a cause of action for breach of contract (Third Cause of Action); however, it appears that Plaintiff has abandoned that cause of action. Defendant moved for summary judgment "on all claims" asserted by Plaintiff; <u>see</u> <u>Defendant's Memorandum in Support of Summary Judgment</u>, p. 1; and neither party addresses a breach of contract claim in their briefs. Furthermore, no evidence has been set forth in the record before this Court of any contract between the parties.



Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this

showing, however, to avoid summary judgment the opposing party must respond to the motion with

specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872,

874-75 (4th Cir. 1992). Here, after careful review and consideration of the arguments and evidence

presented, the undersigned finds and concludes for the reasons set forth hereinbelow that the

Defendant is not entitled to summary judgment in this case.

Plaintiff asserts a disparate treatment race discrimination claim in violation of Title

VII and 42 U.S.C. § 1981[9], based on his assertion that he was subjected to race discrimination when

he was terminated by the Defendant. Plaintiff's claim requires proof of intentional discrimination,

either by direct evidence, by the structured procedures set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973)[10], or through a "mixed-motive" analysis. Plaintiff has not offered any

direct evidence of race discrimination,[11] but nevertheless argues that he has established his disparate

---

[9]To pursue a claim under § 1981, Plaintiff must prove that the Defendant "intended to discriminate [against the Plaintiff] on the basis of [his] race . . . and that the discrimination interfered with a contractual interest." Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006). In South Carolina, even an at-will employee can pursue a claim under § 1981. See Sellers v. South Carolina Autism Soc., Inc., 866 F.Supp. 2d 692, 695-698 (D.S.C. 2012) [Concluding that "at-will employment in South Carolina is contractual in nature and may support a claim under Section 1981."].

[10]Although McDonnell Douglas is a Title VII case, the standards applicable to lawsuits under § 1981 are basically the same as the standards applicable to lawsuits under Title VII, with the same caselaw being used to evaluate a claim under either statute. See Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002)["In analyzing a claim . . . under section 1981, we apply the same standards as in a similar Title VII claim."]; Long v. First Union Corp. of Virginia, 894 F.Supp. 933, 945 (E.D.Va. 1995); Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997).

[11]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996); Black's Law
(continued...)



treatment race discrimination claim, presumably under the <u>McDonnell Douglas</u> analysis and/or the mixed-motive analysis for considering such claims.[12]   The Defendant argues that Plaintiff has failed to present circumstantial evidence to create a genuine issue of fact as to whether Plaintiff's termination occurred because of his race sufficient to survive summary judgment.

**<u>McDonnell Douglas</u> and mixed-motive proof schemes**. The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in <u>McDonnell Douglas</u>. <u>First</u>, Plaintiff must establish a prima facie case of discrimination. If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against him. <u>Second</u>, if this presumption is established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions. <u>Third</u>, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiff's race. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-805; <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-256 (1981); <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 234-235 (4th Cir.

---

[11](...continued)
<u>Dictionary</u>, 460 (6th Ed. 1990) (citing <u>State v. McClure</u>, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974)); <u>see</u> <u>Williams v. General Motors Corp</u>, 656 F.2d 120, 130 (5th Cir. 1981), <u>cert. denied</u>, 455 U.S. 943 (1982).

[12]Historically, consideration of a claim under the mixed-motive analysis was only proper in direct evidence cases, but that is no longer the case. <u>See</u> <u>Hill v. Lockheed Martin</u>, 354 F.3d 277, 284-285 (4th Cir. 2004); <u>Mereish v. Walker</u>, 359 F.3d 330, 339-340 (4th Cir. 2004); <u>cf.</u> <u>Taylor v. Virginia Union Univ.</u>, 193 F.3d 219, 232 (4th Cir. 1999) [en banc]. Further, although Plaintiff does not specifically refer to a "mixed motive" analysis, he constructively asserts that is what occurred by including a "motivating factors" argument in his brief, and that analysis is also applicable under the facts of this case. Therefore, the undersigned has included a discussion of the mixed motive analysis as part of the consideration of Plaintiff's claim.

7



1991).[13]

In contrast to the <u>McDonnell Douglas</u> analysis, which requires a showing that the actions of the Defendant were based on Plaintiff's race, in order to succeed under a mixed-motive analysis the Plaintiff need only demonstrate that his race was a motivating factor for any employment decision, even though other factors may have also motivated the decision, although if the Defendant can demonstrate that it would have taken the same action in the absence of the impermissible motivating factor, Plaintiff's damages are restricted to injunctive and declaratory relief, and attorneys fees and costs. <u>Diamond v. Colonial Life and Accident Insurance Co.</u>, 416 F.3d 310, 317 (4th Cir 2005).

Under either analysis, however, Plaintiff is required to submit evidence to demonstrate that the Defendant's adverse employment decision was motivated by his race. <u>Id</u>. at 318.

### <u>McDonnell Douglas</u> analysis

<u>**Prima Facie case**</u>.  In order to meet the first prong of the <u>McDonnell Douglas</u> formula and establish a prima facie case of race discrimination, Plaintiff must show  (1) that he is a member of a protected class; (2) that he was performing his job satisfactorily; (3) that he was subjected to an adverse employment action; and (4) that he was replaced by someone from outside of his protected class, or there is some other evidence giving rise to an inference of unlawful discrimination.  <u>See generally</u>, <u>Austen v. HCA Health Services of Virginia, Inc.</u>, No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001);  <u>Hughes v. Bedsole</u>, 48 F.3d 1376, 1383 (4th Cir. 1995), <u>cert</u>. <u>denied</u>, 516 U.S. 870 (1995).  <u>See also</u> <u>Gilbert v. Penn-Wheeling Closure Corp.</u>, 917 F.Supp. 1119 (N.D.W.Va.

---

[13]Despite these shifting burdens of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout.  <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 252-253; <u>see</u> <u>also</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993).



1996). For purposes of this motion, Defendant does not contest that Plaintiff is a member of a protected class (African-American), that (until the incident at issue) he was performing his job satisfactorily, and that he was subjected to an adverse employment action when he was terminated. However, Defendant argues that there is no evidence to show that Plaintiff was terminated under circumstances giving rise to an inference of unlawful discrimination.[14] Plaintiff argues that there is evidence showing that similarly situated employees from outside of his protected class were treated more favorably than he was, giving rise to an inference of unlawful discrimination, and in support of this claim discusses several white employees who he contends received more favorable treatment than he received.

Plaintiff first cites to the testimony of Gene Womack (white), who worked for the Defendant from May 2006 through October 2011. Womack Deposition, p. 7. Womack testified that he had himself been lifted on a pallet with a forklift to retrieve secondary control to the overhead crane, and that on at least one other occasion he had been lifted over ten (10) feet high to pull a piece of equipment from storage and "rode" the pallet down. Womack further testified that he had been lifted over six (6) feet without a safety harness "multiple" times. Womack Deposition, pp. 28, 30-31. Womack also testified that Krekich (white) had himself used the forklift to lift Womack on a pallet to a height above Krekich's head (he stands 5'10") in order to dump some material into a construction dumpster. Womack Deposition, pp. 21, 31-32. As previously discussed, Krekich was the individual who initially accused and reported Plaintiff for committing the forklift violation which allegedly was the reason for Plaintiff's termination. Krekich Deposition, pp. 23-24; Weeks Deposition, p. 31.

---

[14]Neither party discusses, or offers any proof regarding, whether Plaintiff was replaced by someone from outside of his protected class.



When asked about the time frame in which he and Krekich had used the forklift to lift or be lifted, Womack estimated that it had occurred within six months of Plaintiff's termination. <u>Womack Deposition</u>, p. 32. There is no evidence that either Womack or Krekich were disciplined for these incidents. Womack also testified that Weeks engaged in this conduct as well. <u>Id</u>.

Jeffrey Wilmoth (white), who was employed as a delivery driver for the Defendant from January 2007 through May 2008, interacted with Plaintiff multiple times a day since Plaintiff was responsible for unloading his truck. <u>Wilmoth Deposition</u>, pp. 9-12. Wilmoth testified that he personally witnessed employees of the Defendant lifting one another on a pallet with the forklift, and further characterized the practice as "not uncommon" which he had observed a "number of times" and recalled that the "forklift was kind of a do-all . . . It lifted people to replace lights in the warehouse and stuff like that." <u>Wilmoth Deposition</u>, pp. 15-18. Wilmoth also testified that he had observed Krekich, Eddie Shealy, and Jim SanSoucie, all white males, engage in this conduct and that none of them had used the requisite safety harness. <u>Wilmoth Deposition</u>, pp. 17-18, 31; <u>see also</u> <u>M. Thomas Deposition</u>, p. 51. Wilmoth testified that he was supervised by Krekich, SanSoucie, who was a dispatcher and his direct supervisor, and Shealy, the branch manager. <u>Wilmoth Deposition</u>, pp. 10-11.

Matthew Thomas, Plaintiff's older brother, was employed by Defendant from January 2006 through October 2011 in various positions, eventually rising to the "unofficial" position of a Rebar Manager. <u>M. Thomas Deposition</u>, p. 7. M. Thomas testified that he had witnessed employees using the forklift to lift one another on a pallet, and that on one occasion Dwight Tover, a Filipino male, lifted SanSoucie over twenty (20) feet in the air, without a safety harness to change a light bulb. <u>M. Thoms Deposition</u>, pp. 50-52. M. Thomas also witnessed Womack lifting SanSoucie with the



forklift, standing on a pallet, to change light bulbs, again without a safety harness. M. Thomas Deposition, pp. 54-55, 57. M. Thomas testified that Krekich, Shealy, and Weeks were all aware of these individuals using the forklift in this manner, and in particular that Weeks was present and observed SanSoucie breaking the rule. M. Thomas Deposition, pp. 52-56. M. Thomas also testified that he saw Weeks, Krekich, SanSoucie, Shealy, and Ed Bentley violate a cardinal safety rule. M. Thomas Deposition, pp. 49-50.

Larry Green worked for the Defendant from 2000 through 2010 and supervised the Plaintiff near the beginning of Plaintiff's employment with Defendant. Later during Plaintiff's employment, Green assisted the Plaintiff and Richardson in the Rebar shop when he wasn't busy. Green Deposition, pp. 6-8. Green testified that Krekich had told him that Plaintiff had lifted Richardson five (5) to six (6) feet or something like that, but that while safety rules required harnesses to work above a certain height, he had seen the rule violated "for years" in order to "change the light fixtures and the light bulbs in the warehouse and stuff like that." Green Deposition, pp. 11-12. When asked about the height employees were lifted, Green testified "[h]owever high they had to go, that's - that's where they lifted them to." Green Deposition, p. 12. Green also testified that SanSoucie used the forklift to change bulbs without a harness "all the time." Green Deposition, p. 14.

When Richardson, who was employed by the Defendant from approximately 2006 through January 2009 and was terminated along with Plaintiff for the same safety violation, was asked if he has seen anybody else do something similar and not get terminated, he replied, "[b]asically everybody" when employees were 'trying to fix something or move something they couldn't get to." Richardson Deposition, pp. 9, 28, 30-31. Richardson testified that the forklift was



used to lift employees well over six (6) feet high to change light bulbs, that safety harnesses were never used, and that "[t]he only time I see a harness was at the safety meeting when they showed us what it was for. Other than that, never seen it used." <u>Richardson Deposition</u>, pp. 35-37.

Plaintiff testified that he had seen Womack lifting SanSoucie on the forklift to change light bulbs in the warehouse without a safety harness. <u>Plaintiff's Deposition</u>, pp. 55-56. Plaintiff testified that Krekich was present and Plaintiff said to Krekich, "Mr. Alex, you know that they're way over six feet. Didn't have a safety harness on. You know that's automatic termination. He just looked at me. Didn't say anything. Smoked his cigarette." <u>Plaintiff's Deposition</u>, p. 57. Neither Womack or SanSoucie was disciplined or fired as a result of this incident. <u>Plaintiff's Deposition</u>, p. 142.

Plaintiff argues that his termination, when all of these white employees engaged in similar conduct and were not terminated or disciplined, gives rise to an inference of discrimination sufficient to survive summary judgment. Defendant argues that these comparators' conduct is not similar to that of the Plaintiff 1) if it occurred prior to the beginning of 2007, when the Defendant contends it had a safety initiatives "crack down", or 2) if it occurred prior to Weeks returning to Charleston from Savannah in late 2008.[15] <u>See Weeks Deposition</u>, pp. 7-9; <u>Strickland Deposition</u>, p. 90. However, Womack testified about an incident where he and Krekich used a forklift to lift or be lifted, and estimated that it had occurred within six (6) months of Plaintiff's termination in January

---

[15]Weeks worked for the Defendant from 2005 until December 2011. Weeks spent approximately eighteen (18) months in Savannah until late 2008, but otherwise worked out of Charleston. <u>See Weeks Deposition</u>, pp. 7-8.



2009.  Womack Deposition, p. 32.[16]  Although he was not specific about the time frame, Womack also testified that Weeks was involved in at least one incident involving lifting without an harness on the man lift or fork lift, which apparently had the same lifting rules.  Womack Deposition, p. 32.  The evidence also includes numerous examples of white individuals violating cardinal safety rules where Krekich and/or Weeks were aware of the situation and/or participated in the violation without any disciplinary action being taken.[17]  Womack Deposition, pp. 21, 31-32; Wilmoth Deposition, pp. 17-18, 31; M. Thomas Deposition, pp. 49, 52-56; Plaintiff's Deposition, pp. 55-57, 142; Green Deposition, p. 11.

This evidence is sufficient to create a question of fact as to whether similarly situated employees outside of Plaintiff's protected class engaged in similar conduct and were not terminated or even disciplined, while Plaintiff was terminated for his conduct.  Cf. Kelley v. United Parcel Service, Inc., 528 Fed. Appx. 285, 286 (4th Cir. June 11, 2013)["In the employee discipline context, a prima facie case of discrimination is established if the Plaintiff shows that he engaged in prohibited conduct similar to that of a person of another race and that disciplinary measures enforced against the Plaintiff were more severe than those enforced against the other person"](internal quotes and citations omitted); Haywood v. Locke, 387 Fed. Appx. 355, 359 (4th Cir. 2010).  Considered in the

---

[16]Defendant attempts to put this event outside of Weeks' return to Charleston, referencing to pages 109-111 of Womack's Deposition.  However, those pages do not appear to be in the record .  In any event, Krekich was on site the entire time.  Further, while Defendant argues that Womack later testified that the only incident after the safety crackdown was instituted in 2007 was the one involving the Plaintiff; see Womack Deposition, p. 93; for purposes of summary judgment the Court is required to view the evidence in the light most favorable to the Plaintiff.  Pittman, 87 F.3d at 118.

[17]The record is also completely devoid of any disciplinary action being taken against any white employees for any of these alleged safety violations, either before or after the alleged "crack down" date in January 2007.



light most favorable to the Plaintiff, the evidence shows that one or more other individuals outside of Plaintiff's class and who held supervisory positions in the warehouse improperly operated machinery either by riding on it inappropriately or lifting other individuals on it or had knowledge of such conduct (including both Krekich and Weeks), and were not terminated or disciplined. This evidence is sufficient to create an inference of disparate, discriminatory treatment, and Plaintiff has therefore established a prima facie case of disparate treatment based on his termination.

        **Legitimate, non-discriminatory reason**. With respect to whether the Defendant has met its burden of producing a legitimate, non-discriminatory reason for its actions, the Defendant has submitted evidence to show that Plaintiff violated three safety rules while in a supervisory position over the other participant, all of which was observed by two other members of management. See Memorandum in Support for Summary Judgment, p. 16. See also, discussion, supra. This evidence is sufficient to establish a legitimate, non-discriminatory reason for the Defendant's decision to terminate Plaintiff. See EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1991) [The Defendant's burden of establishing a legitimate, non-discriminatory reason is only one of production, not of persuasion]; Texas Dep't of Community Affairs, 450 U.S. at 256 [the burden of establishing a prima facie case is not onerous]. Therefore, Plaintiff must present evidence of pretext in the making of the decision to terminate him in order to avoid summary judgment on his claim.

        **Pretext**. In order to show pretext, Plaintiff must show that "but for" the Defendant's intent to discriminate against him because of he is African American, he would not have been terminated. EEOC, 955 F.2d at 941; Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234 (4th Cir. 1991). "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole... must be sufficient for a reasonable fact-finder to infer that the employer's decision was



motivated by [discriminatory animus].'" <u>LeBlanc v. Great American Ins. Co</u>, 6 F.3d 836, 843 (1st Cir.

1993)(citing <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting

<u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991); <u>Reeves v. Sanderson Plumbing</u>

<u>Products, Inc.</u>, 530 U.S. 133, 141-143 (2000). After careful review and consideration of the evidence

and arguments presented in the light most favorable to the Plaintiff, the undersigned finds and

concludes that sufficient evidence of pretext exists to avoid summary judgment on this claim.

   Defendant sets forth three reasons for Plaintiff's termination in its Personnel Action

Directive. <u>See</u> <u>Plaintiff's Deposition Exhibit 10</u>. With regard to the first alleged violation stated in

Plaintiff's termination notice, that Richardson was not supposed to be in the shop due to being on

"Light Duty" Status, numerous employees testified that this was not true. M. Thomas testified that

he, along with the Plaintiff, was present when Krekich and Shealy told Richardson that he could go

back into the Rebar shop and help. <u>M. Thomas Deposition</u>, pp. 22-24. Larry Green also testified that

Richardson worked in the Rebar shop on numerous occasions while he was on light duty because his

supervisors told him to do so; <u>Green Deposition</u>, pp. 21-23; while Plaintiff testified that he was never

told Richardson was on light duty and couldn't be in the shop. <u>Plaintiff's Deposition</u>, pp. 130-131.

Richardson testified that his light duty meant that he couldn't lift and was only allowed to sweep and

stuff like that, and that there was never a period of time when he was not allowed in the Rebar shop

and that he was never told that he was not supposed to be in there on light duty. <u>Richardson</u>

<u>Deposition</u>, pp. 22-23. In addition, Eddie Shealy testified that at the time of the incident when

Richardson was on light duty, that didn't mean that he couldn't be in the Rebar shop; rather, it was

only a restriction on lifting and using his hand. <u>Shealy Deposition</u>, pp. 30-31. Shealy also testified

that he had seen Richardson in the Rebar shop after injuring his arm, but prior to the occasion that



lead to his termination. Shealy Deposition, p. 32. Furthermore, Don Strickland, the Defendant's Area Safety Coordinator, testified that it was more of a manager issue than a safety issue if Richardson was in the Rebar shop when he was not supposed to be in there. Strickland Deposition, pp. 8, 68. Strickland also testified that this was not a "fireable" offense if it had occurred. Strickland Deposition, p. 68; Cf. Reeves, 530 U.S. at 140-143 [setting forth the general proposition that where a plaintiff presents sufficient evidence to raise an inference that the employer's asserted justification for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated.].

With regard to the second alleged violation stated in Plaintiff's termination notice, that the lock out tag out was not properly conducted on the crane, Plaintiff testified that the crane was not "locked up" or "tied down" and was not supposed to have been. Plaintiff's Deposition, pp. 48-49. Plaintiff testified that the "tagout" was dealing more with electricity or electrical problems, and that this crane was not ever supposed to have been locked out or tagged out, and the entire time that he worked in the Rebar shop he didn't lockout or tagout the crane. Plaintiff's Deposition, p. 48. Further, Shealy, who had served as the Defendant's Branch Manager, testified that he never witnessed one of Defendant's employees lockout or tag out the overhead crane. Shealy Deposition, p. 27. Shealy testified that he only performed the lockout or tagout once, when he wanted to prevent an overhead door from being operated, and that it was otherwise performed by an outside contractor when they were performing work. Shealy Deposition, pp. 27-28. Womack also testified that Plaintiff was not committing a lockout/tagout violation on this occasion. Womack Deposition, p. 52. Additionally, there is no evidence that Plaintiff was performing or attempting to perform electrical type work, which is apparently when these procedures are used by outside contractors. This evidence



is sufficient to create an issue of fact as to whether Plaintiff's actions were in fact a violation of any lockout policy.

With regard to the third alleged violation, that fall protection over 6 feet was not executed, Plaintiff testified that he was aware of the safety requirement to wear a harness for work at heights exceeding six (6) feet, and that he was careful not to lift Richardson above that height. Plaintiff's Deposition, pp. 36-38. Richardson also testified that he was only lifted approximately three (3) feet off the ground; Richardson Deposition, pp. 19, 42; while Green testified that Krekich said that Plaintiff had lifted Richardson five (5) to six (6) feet or something like that. Green Deposition, p. 11. Further, even if Plaintiff *did* lift Richardson over six (6) feet, Strickland testified that if an employee did not have a previous safety violation and did not violate a cardinal safety rule that "normally, he would not be terminated." [18] Strickland Deposition, p. 44. In any event, the evidence shows that numerous white employees had engaged in this same type of conduct and were not terminated, or even disciplined, while Plaintiff and Richardson (both African-Americans) were terminated. In conjunction with this discrepancy, Plaintiff has also submitted evidence to show that whites generally treated blacks unprofessionally in the work place. Wilmoth Deposition, pp. 32-34; M. Thomas Deposition, pp. 68-72; Green Deposition, pp. 43-44, 49-51; Plaintiff's Deposition, pp. 78-80.

This evidence is sufficient to show pretext and to create a genuine issue of fact as to a discriminatory animus in the Defendant's decision to terminate the Plaintiff. Cf. Reeves, 530 U.S.

---

[18]In fact, Strickland testified that with regard to an individual who violates a cardinal safety rule being subjected to immediate termination, that it "[d]epends on the history of that individual." Strickland Deposition, pp. 43-44. There has been no testimony that Plaintiff had any prior safety violations.



at 140-143 [setting forth the general proposition that where a plaintiff presents sufficient evidence to raise an inference that the employer's asserted justification for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated.].  While the Defendant has provided evidence to dispute this claim, considering the evidence in the light most favorable to the Plaintiff, as this Court is required to do at summary judgment, the undersigned does not find that "[n]o  reasonable trier of fact could conclude" that Plaintiff's race was a motivating factor in his termination.  Spratley v. Hampton City Fire Dept., 933 F.Supp. 535, 542 (E.D.Va. 1996), aff'd, 125 F.3d 848 (4th Cir. 1997); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)[At summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," are all functions for the trier of fact]; Muhhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D. Pa. 1999); Reeves, 530 U.S. at 140-143.  Therefore, the Defendant is not entitled to summary judgment on this claim.

**Mixed-motive analysis**

Even if the Court were to find the evidence insufficient to establish that "but for" his race, Plaintiff would not have been terminated, he may still proceed with this claim under a mixed-motive analysis.  This proof scheme only requires that Plaintiff demonstrate that his race was a motivating factor in the decision to terminate his employment, even though other factors may also have motivated the decision.  Diamond, 416 F.3d at 317.

To show that Plaintiff's race was a motivating factor in the decision to terminate him (in addition to the fact that whites who had engaged in similar conduct were not terminated or even disciplined), Plaintiff points to Wilmoth's testimony that Weeks would give the African American



employees a hard time.  <u>Wilmoth Deposition</u>, pp. 31-32.  Wilmoth further testified that after Weeks took over as manager that he would hear comments made such as "get the [n----] to do it", and that SanSoucie and Shealy would refer to black employees behind their backs as "n----".  <u>Wilmoth Deposition</u>, pp. 32-34.  There is no evidence that these employees were ever disciplined for this conduct.  M. Thomas testified that SanSoucie said there was a different book (i.e., set of rules) for the people up-front (who were all white except for M. Thomas) and the people in the back (who were all black).  <u>M. Thomas Deposition</u>, pp. 68-69.  M. Thomas also testified that he heard Womack say to SanSoucie when they were arguing "you are nothing but a racist," referring to how SanSoucie talked about black people, following which Womack warned M. Thomas to "be careful".  On another occasion, a customer referred to a black employee as a "n----" in front of Weeks, SanSoucie and Shealy, and they all "laughed about it and did not speak up for the black employee".  These employees also made disparaging remarks about Hispanics.  <u>M. Thomas Deposition</u>, pp. 71-73. Richardson testified that people would use the "n" word at the work place, in particular Womack, and then make jokes and comments.  <u>Richardson Deposition</u>, p. 37. Green testified that there were different rules applied to black and white employees and that black employees were subjected to stricter rules; <u>Green Deposition</u>, pp. 32, 43-44, 49-51; while Plaintiff testified that a (white) truck driver named Tony made a comment to Plaintiff and Richardson about picking cotton and laughed about the matter.  <u>Plaintiff's Deposition</u>, pp. 78-79, 142.  Plaintiff testified that when he reported this incident to Eddie Shealy, who was the general manager at the time, Shealy just laughed.  <u>Plaintiff's Deposition</u>, pp. 79-80; <u>see</u> <u>also</u>, <u>Plaintiff's Deposition</u>, p. 86.

　　　　　　Considered in the light most favorable to the Plaintiff, this evidence reflects a generally lax and discriminatory atmosphere at the Defendant's plant regarding racial matters, as well



as a general insensitivity to African-Americans in the workplace and with respect to the Defendant's regard for such workers. As such, there is a question as to whether race may have been a motivating factor in the decision to terminate Plaintiff's (and Richardson's) employment under the facts presented sufficient to survive summary judgment on this claim.

**<u>Conclusion</u>**

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted** with respect to Plaintiff's claims for harassment, retaliation, and breach of contract. It is further recommended that Defendant's motion be **denied** with respect to Plaintiff's termination claim.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

February 27, 2014
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

21
