**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| SAMUEL THOMAS, | ) | |
| | ) | No. 2:12-cv-01249-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CMC STEEL FABRICATORS, INC., | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on a report and recommendation ("R&R") issued by United States Magistrate Judge Bristow Marchant. The magistrate judge recommends that the court grant in part and deny in part defendant's motion for summary judgment. For the reasons that follow, the court adopts the R&R and grants in part and denies in part the motion for summary judgment.

## I.  BACKGROUND

### A.  Factual History

As is required on a motion for summary judgment, the court construes the facts of this case in the light most favorable to the non-moving party. Plaintiff Samuel Thomas ("Samuel")[1], an African American man, worked for defendant CMC Steel Fabricators ("CMC") from December 2005 until January 2009. Compl. ¶¶ 17, 21. By the time he was discharged by CMC, Samuel had risen to the position of rebar supervisor. Pl.'s Opp'n to Mot. Summ. J. 2. As the supervisor for CMC's rebar shop, Samuel supervised one other employee, an African American man named George Richardson

---

[1] Because plaintiff's brother Matthew Thomas is a witness in this case, and because the court discusses the deposition testimony of both brothers, the court refers to each of these gentlemen by their first names.

1

("Richardson"). Id. At the time of the events in question, Richardson had a hand injury and had been restricted to light duty. Richardson Dep. 22:8-20, May 6, 2013.

On Friday, January 9, 2009, Samuel, Richardson, and white employee Harold Eugene Womack ("Womack") were loading rebar onto Womack's truck when the remote control for the ceiling-mounted crane they were using stopped working. Samuel Dep. 33:1-6, Apr. 12, 2013. Samuel reported the problem to Alex Krekich ("Krekich"), a white sales manager, and returned to the rebar shop to try to address the problem. Pl.'s Opp'n 2. Though the ceiling-mounted crane's primary remote control had stopped working, the crane also had a secondary control affixed to it. Id. To better see how the secondary control was affixed to the crane, Richardson stood on a pallet and Samuel used a forklift to lift that pallet into the air. Id.

Samuel maintains that he was careful not to lift Richardson's pallet more than six feet in the air because CMC safety regulations require workers to wear safety harnesses if they work at heights exceeding six feet. Id. Richardson testified that Samuel lifted him "maybe about three feet" in the air. Richardson Dep. 19:21-20:1. Krekich, who entered the rebar shop to check on the problem, testified that Richardson was "[a]pproximately eight feet or more" into the air. Krekich Dep. 28:3-7, May 29, 2013. Krekich ordered Samuel to get Richardson down. Pl.'s Opp'n 2. White area manager Kyle Weeks ("Weeks") briefly saw Richardson standing on the front of the forklift. Weeks Dep. 29:9-17, May 22, 2013. Weeks testified that Richardson had been lifted to roughly the height of a man, but that he did not know what that exact height was. Id. at 29:18-24.

On Monday, January 12, 2009, CMC fired Richardson and Samuel. In a Personnel Action Directive ("PAD") issued on January 12, 2009, Weeks wrote that Samuel was discharged because he

> was involved in 3 violations of safety policies on Friday [January 9, 2009]. (1) George Richardson was not supposed to be in the shop due to "Light Duty" status. (2) Lock out tag out was not properly conducted on the crane. (3) Fall protection over 6 feet was not executed. Both employees suspended until review by Safety Manager & GM.
>
> Both employees acknowledged they were in the wrong. After discussion with Scott Williams & Don Strickland (Safety Mgr.) both employees were terminated.

Samuel Dep. Ex. 10.

### B. Procedural History

Samuel filed an employment discrimination charge with the South Carolina Human Affairs Commission and the Equal Employment Opportunity Commission and received a notice of right to sue on February 16, 2012. Samuel then timely filed his complaint in this court on May 11, 2012. Samuel's complaint alleges three claims against CMC: (i) harassment, retaliation, and wrongful termination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (ii) harassment, retaliation, and wrongful termination in violation of 42 U.S.C. § 1981; and (iii) common law breach of contract.

On August 7, 2013, CMC moved for summary judgment on all of Samuel's claims. In a response dated August 26, 2013, Samuel conceded that his harassment and retaliation claims could not survive summary judgment, but argued that summary judgment was inappropriate on his wrongful termination claim.

On February 27, 2014, the magistrate judge issued his R&R, recommending that CMC's motion for summary judgment be granted with respect to Samuel's harassment,

retaliation, and breach of contract claims. The magistrate judge further recommended that the motion be denied with respect to Samuel's wrongful discharge claim. CMC filed objections to the R&R on March 17, 2014. The matter has been fully briefed and is ripe for the court's review.

## II.  STANDARDS

The court is charged with conducting a de novo review of any portion of the R&R to which specific, written objections are made, and may accept, reject, or modify, in whole or in part, the recommendations contained in that report. 28 U.S.C. § 636(b)(1). The magistrate judge's recommendation does not carry presumptive weight, and it is the responsibility of the court to make a final determination. Mathews v. Weber, 423 U.S. 261, 270-71 (1976). A party's failure to object may be treated as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140, 150 (1985).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255.

### III.  DISCUSSION

Neither party has objected to the recommendation that summary judgment is appropriate on Samuel's harassment, retaliation, and breach of contract claims.  Indeed, Samuel has expressly conceded that his harassment and retaliation claims "do not lie." Pl.'s Opp'n 1.  Keeping in mind that a party's failure to object may be treated as agreement with the conclusions of the magistrate judge, see Thomas, 474 U.S. at 150, the court grants summary judgment on those claims without further comment.

What remains to be considered is whether summary judgment is appropriate with respect to Samuel's wrongful discharge claim, which he asserts pursuant to Title VII and 42 U.S.C. § 1981.[2]  The magistrate judge found that Samuel could survive summary judgment on either a pretext theory or a mixed-motive theory and CMC objects to these findings.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual or otherwise to discriminate against any individual . . . because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).

In general, there are "two avenues" by which a plaintiff may prove wrongful discharge based on discrimination.  See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc).  First, a plaintiff may establish discrimination by "demonstrating through direct or circumstantial evidence that . . . discrimination motivated the employer's adverse employment decision."  Hill, 354 F.3d at 284.  Such cases are frequently referred to as "mixed-motive" cases because "the employee need not demonstrate that the prohibited characteristic was the sole motivating

---

[2] The court analyzes both Title VII and § 1981 claims under the same standards.  See, e.g., Long v. First Union Corp. of Va., 894 F. Supp. 933, 945 (E.D. Va. 1995).

factor to prevail, so long as it was a motivating factor." Id. The second avenue available to plaintiffs is to follow the burden-shifting approach first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The McDonnell Douglas framework establishes a three-step proof scheme under which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant; however, the ultimate burden of persuasion never shifts from the plaintiff to prove intentional unlawful discrimination. See Williams v. Cerberonics, Inc., 871 F.2d 452, 456 n.2 (4th Cir. 1989). Cases that employ the McDonnell Douglas are often called "pretext" cases because the plaintiffs must ultimately prove that the reasons given for their termination were pretextual. Hill, 354 F.3d at 285.

### A. Mixed Motive

CMC asserts that the magistrate judge erred by finding that Samuel had presented enough evidence to survive summary judgment on a mixed-motive theory of his case. A plaintiff "succeeds on a mixed-motive claim if [he] 'demonstrates that race color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 317 (4th Cir. 2005) (quoting 42 U.S.C. § 2000e-2(m)). In a case like this one, a plaintiff may present either circumstantial or direct evidence that race was a factor in his termination. Id.

> To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision. The protected trait must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

Hill, 354 F.3d at 286 (internal quotations omitted).

6

Samuel, his brother, Womack, Jeffrey Wilmoth ("Wilmoth"), and Larry Green ("Green") all testified that white employees were given preferential treatment at CMC or that white employees and customers occasionally made racist remarks about African American people. At least some of the racist behavior has been attributed to Kyle Weeks ("Weeks"), one of the CMC managers who discharged Samuel. See, e.g., Wilmoth Dep. 31:21-32:14 (explaining that Weeks was one of the white employees who gave black employees a hard time). This testimony is enough to raise a genuine question of material fact regarding whether discriminatory animus can be attributed to the actual decision-makers. See Hill, 354 F.3d at 288. As a result, the court agrees with the magistrate judge that Samuel's wrongful discharge claim is viable under a mixed-motive theory.

### B. The McDonnell Douglas Pretext Framework

CMC also contends that the magistrate judge erred by finding that Samuel had carried his burden under the McDonnell Douglas pretext framework. Under McDonnell Douglas, a plaintiff may avert summary judgment by establishing a prima facie case of discrimination and by demonstrating that the employer's proffered reasons for termination were mere pretext for discrimination. CMC argues that Samuel failed to make these necessary showings.

The McDonnell Douglas framework has three steps. The plaintiff must first establish a prima facie case of discrimination. Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). To establish a prima facie case of racial discrimination under Title VII, a plaintiff "must show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under

7

apparently similar circumstances." Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 133, 133 n.7 (4th Cir. 2002). Once the plaintiff establishes a prima facie case, the employer must produce evidence of a legitimate, non-discriminatory reason discharging the employee. McDonnell Douglas, 411 U.S. at 802. Finally, if the defendant meets this burden, the plaintiff must then prove that the defendant's proffered reasons "were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). "At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." Hill, 354 F.3d at 285 (internal citations omitted).

### 1. Prima Facie Case

The parties appear to agree that Samuel has sufficiently demonstrated the first three elements of a prima facie case of wrongful discharge. However, CMC objects that Samuel has not met the fourth element, that is, that he has not shown that similarly situated non-African American employees were not fired for similar conduct. Specifically, CMC objects that: (i) the comparators Samuel mentions were subject to different safety standards than he was; (ii) Samuel has not shown that the decision-maker in his case knew about these other incidents; (iii) Samuel has not shown that the white comparators had the same supervisor that he did; and (iv) the comparators' conduct and Samuel's conduct were not substantially similar.

#### a. Samuel's comparators were both employees and supervisors.

Samuel presented evidence that non-African American CMC employees frequently lifted each other above six feet on forklifts without any repercussions. Samuel testified that he saw Womack raise white employee Jim SanSoucie ("SanSoucie") on the

8

front of a forklift without a safety harness so that SanSoucie could change light bulbs. Samuel Dep. 56:2-24. Samuel testified that supervisor Krekich saw this incident, but that Womack and SanSoucie were not disciplined. Id. at 57:1-24. Samuel could not remember the date of this incident. Id. at 56:16-20.

Womack testified that "I've been up there myself on a forklift [to retrieve a secondary control], yeah." Womack Dep. 28:10-11. He explained that he had gotten on a pallet and a temporary worker had lifted up his pallet with a forklift to allow him to reach the secondary control. Id. at 28:12-20. Womack also testified that Krekich had lifted him up on the forklift at least one other time to pull some equipment from a mezzanine about ten feet above the floor of the warehouse. Id. at 30:15-21. Womack elaborated that he had been lifted on a forklift to a height exceeding six feet on multiple occasions, and that at least some of these occasions occurred within six months of Samuel's January 2009 termination. Id. at 31:2-32:16.

Green, who worked at CMC from 2000 to 2010, testified that, "for years," he saw co-workers "[g]o up and – and take – change the light fixtures and the light bulbs in the warehouse and stuff like that. They didn't have harnesses. . . . They – they did it every day. . . . However high they had to go, that's – that's where they lifted them to." Green Dep. 12:2-25, May 13, 2013.

Matthew Thomas ("Matthew"), Samuel's brother, also worked at CMC for many years. Matthew testified that he once saw a Filipino American supervisor, Dwight Tover ("Tover"), lift SanSoucie "up with a pallet on the forklift up to change a light bulb with no safety harness." Matthew Dep. 50:12-51:19, May 6, 2013. Matthew also testified that

9

Weeks instructed Tover and SanSoucie to change the warehouse light bulbs in this fashion. Id. at 53:1-54:13.

### b. At least one of Samuel's comparators was subject to the same safety standards.

CMC asserts that Samuel has failed to make a prima facie case because he was subject to different safety standards than the comparators mentioned above. While CMC apparently has always had a rule against employees riding on the front of forklifts, this rule was only enforced after the company's "major safety stand-down thing." Womack Dep. 28:24-29:2. Don Strickland ("Strickland"), a white safety coordinator, gave somewhat conflicting testimony about the time frame of the company's safety initiative. He stated that the two major phases of the safety initiative were implemented by March 31, 2007 and June 30, 2007, but also that "there was a really big effort put [on safety policies] on 2006." Strickland Dep. 90:8-25, May 17, 2013.

The witnesses' testimony gives rise to a factual dispute about whether Samuel's comparators were subject to the same safety standards as he was. A fact-finder who credited Womack's testimony that he had been lifted on a forklift within six months of Samuel's termination as well as Strickland's testimony regarding CMC's safety policy enforcement could easily find that Womack was subject to the same safety standards as Samuel. CMC's argument to the contrary is unavailing.

### c. At least one of the decision-makers who fired Samuel was in the same role.

CMC next argues that Samuel failed to prove his prima facie case because he has not shown that Weeks knew about any comparable safety violations and because Weeks did not supervise any of the comparators mentioned.

10

While CMC is correct that courts must focus on the discriminatory intent of the decision-maker when evaluating a Title VII claim, see Hill, 354 F.3d at 291, CMC's argument fails because there was more than one decision-maker in this case. Weeks testified that he and Scott Williams ("Williams"), CMC's general manager, decided to fire Samuel. Weeks Dep. 50:25-51:2 ("[U]ltimately it was Scott Williams, he said we did need to terminate him and he authorized that decision."); id. 55:18-21 ("[The decision] was not solely mine it was with consultation of Scott Williams. . . . Ultimately it was his decision."). There is evidence that Williams, one of the decision-makers in this case, has been CMC's general manager since at least 2007. See Strickland Dep. 88:15-17, 90:6-16 (noting that Williams would have issued the safety initiative memo that circulated in early 2007). Moreover, there is evidence that Krekich, a manager, knew about previous forklift violations and failed to act. Samuel Dep. 57:2-14; see also Tate v. Weyerhaeuser Co., 723 F.2d 598, 606 (8th Cir. 1983) cert. denied, 469 U.S. 847 (1984) (holding that "[a]lthough a change in managers is not a defense to claims of racial discrimination," it may suggest a permissible basis for different treatment).

Weeks' lack of involvement with or knowledge about the comparable incidents does not doom Samuel's prima facie case.

### d. The comparators' conduct was substantially similar.

CMC next contends that the comparators' conduct was not substantially similar to Samuel's conduct. In particular, CMC points out that there is no evidence that: (i) other comparators were supervisors who asked employees they supervised to assist in the safety violation; (2) the employees involved only had the use of one arm; (3) the employees involved were riding the fork lift close to live high-voltage wires; (4) the

11

employees riding the forklift could easily have been killed; (5) the employees' actions were witnessed by an area manager; or (6) the comparable safety violations occurred after the safety crackdown.

These are largely distinctions without a difference. All of the comparators cited by Samuel broke CMC's safety rules by riding on the front of a forklift or by lifting a co-worker up on the front of a forklift. See Weeks Dep. 38:22-24 ("In their forklift training it clearly states that you are not suppose [sic] to have any person, any being on the front end of the forklift."); Strickland Dep. 71:4-7 (stating that lifting an employee on a forklift is a safety violation regardless of whether the employee is on light duty). There is also evidence that some of the employees involved in these incidents were supervisors and that other supervisors or managers knew about these incidents. As discussed above, at least one of the comparable incidents may have occurred after CMC stepped up its safety enforcement.

In summary, the court agrees with the magistrate judge that Samuel has met his burden of showing a prima facie case. See Kelley v. United Parcel Serv., Inc., 528 F. App'x 285, 286 (4th Cir. 2013) ("In the employee discipline context, a prima facie case of discrimination is established if the plaintiff shows that he 'engaged in prohibited conduct similar to that of a person of another race . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.'") (quoting Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).

### 2. Legitimate Non-Discriminatory Reason

After a plaintiff has established his prima facie case of discriminatory termination, the burden of production shifts to the employer who must articulate a legitimate, non-

discriminatory reason for the employment action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 336 (4th Cir. 2011). The magistrate judge found, and neither party disputes, that CMC met its burden of producing a legitimate, non-discriminatory reason for firing Samuel in the PAD issued on January 12, 2009. Samuel Dep. Ex. 10. The court agrees with the magistrate judge that CMC sufficiently articulated a legitimate, non-discriminatory reason for firing Samuel.

### 3. Pretext

The magistrate judge found, at the final step of the McDonnell Douglas analysis, that Samuel had met his burden of showing that the reasons for his firing were pretextual. CMC objects to the R&R on the following grounds: (i) the magistrate judge should have considered all of CMC's articulated reasons for firing Thomas, not just the reasons articulated in the January 12, 2009 PAD;[3] (ii) Thomas failed to proffer evidence that each of CMC's articulated reasons for firing him was pretextual; (iii) the magistrate erred by finding that the articulated reasons included in the PAD were pretextual; and (iv) that none of the reasons CMC has given for firing Thomas amount to pretext. CMC makes several overlapping objections to the magistrate judge's finding. Because these objections bleed into one another, the court reviews them together.

Where a defendant employer carries its burden to produce evidence of a legitimate, non-discriminatory reason for its actions, "the presumption raised by the prima facie case is rebutted," Burdine, 450 U.S. at 255, and the prima facie case thus "is no longer relevant" and "simply drops out of the picture." St. Mary's Honor Ctr. v.

---

[3] CMC's objections include two separate sections entitled "It was error for the Magistrate Judge to consider only what was written in the Personnel Action Directive (PAD) as the reasons for Plaintiff's discharge" and "The Magistrate Judge should have considered all of the evidence offered about the reasons for Plaintiff's discharge." Def.'s Objections 6, 8. Because these arguments are so closely related, the court considers them as a single objection.

Hicks, 509 U.S. 502, 510-11 (1993). In this third step, the question becomes whether the plaintiff can demonstrate that the employer's stated reason is pretextual, which requires the plaintiff "to prove 'both that the reason was false, and that discrimination was the real reason.'" Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quoting Jiminez v. Mary Washington Coll., 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original). "A plaintiff could accomplish this goal 'by showing that the employer's proffered explanation is unworthy of credence.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (quoting Burdine, 450 U.S. at 256). The court's analysis, however, requires more than a simple determination whether an employer's proffered reasons for discharge are specious.

> The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.
>
> . . .
>
> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law

Reeves, 530 U.S. at 146-49 (quotations omitted) (emphasis in original).

### a. The court considers all legitimate non-discriminatory reasons proffered by CMC.

CMC first argues that the magistrate judge erred by failing to address all the reasons that CMC has proffered as legitimate, non-discriminatory reasons to terminate Samuel's employment. While the magistrate judge addressed the three reasons written in

the PAD, he did not discuss Weeks's deposition testimony that Samuel was fired because "you are not suppose [sic] to have any person, any being on the front end of a forklift." Weeks Dep. 38:23-24. CMC's motion for summary judgment undoubtedly focuses on the three reasons articulated in the PAD as the legitimate, non-discriminatory reasons for Samuel's discharge. See, e.g., Def.'s Mot. Summ. J. 5, 9. Nevertheless, in an abundance of caution, the court will consider this fourth reason in addition to the reasons already discussed in the R&R. See United States v. George, 971 F.2d 1113, 1118 (4th Cir. 1992) ("We believe that as part of its obligation to determine de novo any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate.").

In this case, Samuel has presented evidence that undermines each of the four reasons that CMC lists as the reasons that Samuel was fired.

### b.  First reason:  George Richardson was on light duty.

CMC's first reason is that "George Richardson was not supposed to be in the shop due to 'Light Duty' status." Samuel Dep. Ex. 10. However, Shealy, a CMC branch manager and safety coordinator, testified that, on January 9, 2009, Richardson "was permitted to be in the rebar shop. He just wasn't, you know, permitted to do any heavy lifting . . . . He had to conform to – to light duty work." Shealy Dep. 31:15-18, May 13, 2013. Strickland, another CMC safety coordinator, testified that allowing Richardson to be in the rebar shop was "more the manager's . . . problem than it is a safety issue." Strickland Dep. 68:7-9. Strickland then clarified that Richardson's presence in the rebar shop was not a safety offense that could result in Samuel's termination. Id. at 68:10-13.

15

### c.  Second reason:  Lock out/tag out was not performed.

CMC's second reason for firing Samuel is that "Lock out tag out was not properly conducted on the crane."  Samuel Dep. Ex. 10.  "Lock out/tag out" is the process by which CMC's electrical and mechanical equipment is shut down when it malfunctions.  See Weeks Dep. 40:10-14.  CMC's safety manual states that failing to properly lock out and tag out equipment is a terminable offense.  Samuel Dep. Ex. 5.  In his deposition, however, Samuel testified that lock out/tag out "was dealing more with electricity, electrical problems," that he was not required to lock out and tag out the crane when its remote control stopped working, and that he had never locked out and tagged out the crane in the course of his employment at CMC.  Samuel Dep. 48:11-18.  Womack also testified that Samuel had not committed a lock out/tag out violation on January 9, 2009.  Womack Dep. 52:1-5.

### d.  Third reason:  Fall protection was not used.

CMC's third reason is that "Fall protection over 6 feet was not executed."  Samuel Dep. Ex. 10.  Strickland and others testified that CMC had adopted the construction industry's standard for working at heights, which is that anyone working at a height of more than six feet off the ground had to wear a safety harness.  See, e.g., Strickland Dep. 43:6-9.  Violating this six-foot fall protection rule is a terminable offense at CMC.  Id. at 43:21-24.  As described in greater detail above, Richardson and Samuel both dispute that Samuel lifted Richardson six feet or more into the air.  Samuel, Matthew, Womack, and Green also testified that they had seen white employees break the six-foot fall protection rule without suffering any consequences.

### e. Fourth reason: The forklift policy was violated.

Finally, CMC's fourth reason for discharging Samuel is that he had lifted Richardson on the front of a forklift. There is conflicting testimony about whether this action constituted a terminal offense. Strickland testified that "From what I was told, by them being on the forklift, him lifting him on the forklift . . . then they're both terminal offenses." Strickland Dep. 71:4-8. Strickland also testified that an employee would generally not be terminated for a safety violation if the violation was his first offense and it was not a violation of a cardinal safety rule. Strickland Dep. 44:8-18. Weeks testified that riding on the front end of a forklift was grounds for immediate termination. Weeks Dep. 39:6-25. Shealy, however, testified that lifting someone on the front end of a forklift was not a cardinal safety rule violation and therefore was not a terminal offense. Shealy Dep. 35:2-7. CMC's employee handbook indicates that riding on the front end of a forklift is not a cardinal safety rule. Samuel Dep. Ex. 5 at 15.

Certainly, Samuel has presented evidence that suggests that the articulated reasons for his discharge were pretextual. In the light most favorable to him, CMC's reasons for firing Samuel appear both unpersuasive and contrived. As discussed above, at least some of the racist behavior attributed to CMC employees has been attributed to Weeks, one of the managers responsible for Samuel's discharge. While the evidence that Weeks was motivated by discriminatory intent is somewhat thin, the court must credit that evidence for this motion for summary judgment. As a result, the court finds that Samuel has met his burden to show <u>both</u> that CMC's reasons for discharging him were pretextual <u>and</u> that the real reasons for his discharge was intentional discrimination. Therefore, summary judgment is inappropriate on Samuel's wrongful discharge claim.

## IV.   CONCLUSION

For the foregoing reasons, the court **ADOPTS** the magistrate judge's R&R, ECF No. 39, and **GRANTS IN PART AND DENIES IN PART** defendant's motion for summary judgment, ECF No. 32.  The court grants summary judgment in favor of defendant as to plaintiff's harassment, retaliation, and breach of contract claims.  The court denies summary judgment as to plaintiff's wrongful termination claims.

**AND IT IS SO ORDERED**.

*[signature]*

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 31, 2014**
**Charleston, South Carolina**